IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2019

## STATE OF TENNESSEE v. RICKY BOYD

**Appeal from the Criminal Court for Shelby County**
No. 15-05652      Lee V. Coffee, Judge

_____

### No. W2018-00546-CCA-R3-CD

_____

A Shelby County Criminal Court Jury convicted the Appellant, Ricky Boyd, of attempted second degree murder, aggravated rape, and rape. At the sentencing hearing, the trial court merged the aggravated rape and rape convictions and imposed a total effective sentence of thirty-seven years in the Tennessee Department of Correction. On appeal, the Appellant contends that (1) the trial court erred by denying his motion to dismiss the indictment; (2) the trial court erred by granting the State's motion to quash the Appellant's subpoena duces tecum seeking "the District Attorney's records concerning the time that [the Appellant's] case was presented" to the grand jury; (3) the trial court erred by denying the Appellant's request to review the victim's mental health records; (4) the trial court erred by refusing to allow defense counsel to cross-examine the victim regarding her history of audio and visual hallucinations and her refusal to take medication to treat her condition; (5) the trial court erred by refusing to dismiss the case or give a Ferguson instruction based upon the State's failure to preserve evidence that might play a significant role in the defense; (6) the State's evidence was not sufficient to sustain his convictions; and (7) "the trial court erred by considering a prior charged offense during its deliberations as to sentencing even though the [Appellant] [pled] guilty to a lesser charge of aggravated assault and no factual basis surrounding the negotiated plea [was] entered into evidence." Upon review, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Stephen Bush and Phyllis Aluko (on appeal), Memphis, Tennessee; Jessica L. Gillentine (on appeal), Bartlett, Tennessee; and Jacinta Hall and Samuel Christian (at trial), Memphis, Tennessee, for the Appellant, Ricky Boyd.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jessica Banti, Gavin Smith, and Lessie Rainey, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## I.  Factual Background

The Appellant was indicted on charges of attempted first degree murder, aggravated rape resulting in bodily injury, and aggravated rape by use of force and coercion and by use of a deadly weapon.

At trial, the victim testified that on May 2, 2014, she was living alone in a house on Willie Mitchell Boulevard in Memphis.  In the afternoon, she walked to a nearby store and bought a bag of chips and a drink.  She returned home and sat outside on the porch to eat.  She was wearing white shorts, a white t-shirt, and gold shoes with high heels.  She went inside when it started getting dark.

The victim said that around 5:00 or 6:00 p.m., she heard a knock on the front door.  She was not expecting anyone but opened the wooden front door and looked through the glass storm door to see who was knocking.  She saw a "young dude" whom she had never seen before that night.  The man was taller than the victim, "brown skinned," and had "short dreads."  He was wearing a black t-shirt, black pants, and black shoes.  The man asked her to open the door so that he could tell her something.  The man told her that someone was inside her house who wanted to "do something to [her]."  The victim initially refused to open the door, but after much coaxing by the man, she stepped onto the front porch and walked down the porch steps.

The victim said that the man stepped close to her and put his face within two inches of her face.  He repeated that someone was inside her house and "wanted to get her."  He said, "Don't think it's me 'cause it will probably be my twin."  The man's voice was raised as if he were angry.  The victim asked, "What twin?"  The man hit her in her mouth with his fist and "knocked [her] teeth out."  She fell to the ground but immediately stood up to see where the man was.  She saw him run "around [her] house somewhere" but could not see exactly where he went.  She walked toward the front of her house and looked around because she was afraid to go into the house.  She said, "I thought something bad [was] going to really happen to me."  She heard footsteps behind her and closed her eyes because she was scared.  She said someone "snuck up" behind her and "did some terrible things to [her]."

The victim said she "ended up blanked out, knocked out cold."  The next thing she remembered was waking up in the hospital after surgery.  She was bruised, her mouth was

swollen, and she had stitches on her neck near her jaw. The police visited her during her hospitalization, showed her pages of photographs, and asked if she recognized anyone in the photographs. She was unable to identify the man who came to her house from the photographs. The victim said she described the man to the police. She and the police made a computer-generated drawing that the victim said almost looked like the person who came to her house. She did not recall how long she was hospitalized.

The victim said that when the man spoke to her in her yard, he said a name, but she did not hear it "clear enough." She thought the name started with the letter M. The State asked the victim to look at the Appellant in court and say whether he was the man with whom she spoke in her yard. The victim said the Appellant was not the man who lured her into the yard. The victim identified photographs of her underwear and shoes that were taken at the crime scene.

On cross-examination, the victim acknowledged that the incident occurred over three years before trial and that she had problems remembering everything that happened "because [she] was knocked out cold." The victim said that after she awoke in the hospital, she drew a picture of "the dude who attacked [her]." She explained that she was an artist and could draw. The police later used the drawing to make a computer-generated image of the man. The victim was asked if she recalled giving the police the name "Marcus, or Marius, or Maurice." The victim initially stated, "Marcus, I think." She then said she remembered telling the police, "Something like that. Maurice. . . . Almost like the U is the c-u-s."

The victim acknowledged that while she was hospitalized, she was given a lot of pain medication. She had difficulty talking because she was hoarse, her mouth was sore, and she had a tube down her throat. She did not recall telling anyone that she had been raped, saying, "I didn't even know I was raped."

The victim denied having "developmental delays." She recalled speaking with a psychiatrist in the hospital and telling the psychiatrist "about some of the problems [she was] having." She did not remember being in a grassy lot down the street from her house.

On redirect examination, the victim said the man who came to her house had "[b]rown skin, almost like dark skin." She maintained that she had told the police the man said he had a twin brother but that the police did not hear her because she "was talking real low." The victim explained that the name Maurice or Marcus referred to the man's brother.

Jarred Lucius testified that on May 2, 2014, he was an officer with the Memphis Police Department. He was dispatched to the area of Willie Mitchell Boulevard and Olive Avenue in response to a call about "a woman screaming for help." As he drove through the area, he did not hear anyone calling for help. He used his public announcement (PA) system to identify himself and advise that anyone who needed help should let him know.

Officer Lucius stopped and exited his vehicle. He heard rustling and saw the victim walking out of the woods. The victim "looked really bad off." She had "blood oozing from the sides of her mouth," and she was crying and shaking. Her clothes were disheveled, she had difficulty walking, and leaves were stuck in her long hair and all over her clothes. She was not wearing shoes, "and her feet looked like they were all messed up on the bottoms." The victim tried to talk but could only make "gurgling" sounds as if something were "lodged in her mouth." Officer Lucius asked the victim what had happened to her, and the victim pointed at her mouth and "at her private area." Officer Lucius stated that the victim "finally said, 'He raped me,' but it came out more with a W instead of an R." Officer Lucius asked if the victim had been raped, and she nodded her head and seemed excited that he understood her. Officer Lucius called paramedics, who responded to the scene and eventually transported the victim to the hospital.

Officer Lucius said that the medical staff at the hospital discerned that the victim was complaining about her mouth. They looked inside her mouth and saw a large brown "stick sticking out of her esophagus at the base of her mouth." They immediately performed surgery to remove the stick. After the surgery, the doctors put the stick in a Ziploc bag and gave it to Officer Lucius. Officer Lucius later gave the stick to the crime scene investigators.

On cross-examination, Officer Lucius said that he responded to the scene at approximately 3:30 or 4:00 a.m. Officer Lucius could not recall if the victim had scratches on her body. Officer Lucius said that he did not come into contact with any persons of interest but acknowledged that a police report reflected that another officer later came into contact with a man named Salvador Taylor.

Memphis Police Officer Roderick Knight testified that around 4:00 a.m. on May 3, 2014, he went to an open field in the area of Willie Mitchell Boulevard and Olive Avenue in response to a 911 call. He and Officers Gerard and Lawson parked their patrol cars and rolled down their windows. The officers heard a faint noise, and Officer Knight used his PA system to encourage anyone who needed help to approach the officers, but he received no response. The officers drove south on Olive Avenue, and Officer Lawson heard another noise and stopped his patrol car. He saw someone, exited his car, and ran after the person. Officer Knight joined the pursuit even though he could see only the silhouette of the person he was chasing. Officer Knight estimated that twenty or twenty-five minutes elapsed between the 911 call and the pursuit. Officer Knight lost sight of the person and returned to his patrol car. The paramedics arrived at the scene and advised him of the victim's condition.

Crime Scene Officer Christopher Sanders testified that he was dispatched to the area of Willie Mitchell Boulevard and Olive Avenue. He described the scene as a "grassy vacant lot" with "a couple of buildings to the south, some houses and buildings to the north, and a vacant area to the west." At the scene, Officer Sanders took photographs of a pair of

women's underwear, a woman's gold shoe, a branch or stick stained with a dry red substance that appeared to be blood, and an indentation or tracks in the ground.

On cross-examination, Officer Sanders said that he photographed the stick, but he did not test it for blood and did not know "for certain" the red substance was blood. He used an alternate light source in the area where the incident could have occurred but did not detect any "possible DNA" or other fluids.

Theodore Novak, IV, a firefighter paramedic with the Memphis Fire Department, testified that he was dispatched to the intersection of Willie Mitchell Boulevard and Olive Avenue in response to a "sexual assault call." At the scene, he and another paramedic, Christopher Brumley, saw the victim leaning against the back of a patrol car. The victim appeared to be "in bad shape." Novak approached the victim and noticed a lot of blood coming from her mouth. Her hair and clothes "looked like she had been in an altercation." The victim told Novak, "He tried to kill me." The victim's airway was not obstructed, but her words were difficult to understand because of the trauma to her mouth.

Novak said that with assistance, the victim was able to walk to the ambulance. Novak said the victim appeared to be missing part of her tongue, and she was reluctant to open her mouth. A "C-collar" was placed around the victim's neck to immobilize her head and prevent potential injury to her spine. Before putting the collar on, the paramedics questioned the victim about her injuries. The victim said that she had been raped, beaten, and that, "He tried to kill me." After the collar was on, the victim was unable to open her mouth fully, and her speech was further impaired. The paramedics had the victim remain seated upright because she was bleeding profusely. The police informed the paramedics that they had found a stick that was approximately one foot long and "appeared to have blood or bodily fluids on it." The paramedics checked the victim for additional trauma but found no other injuries. The paramedics asked the victim how much pain she was experiencing, and she indicated "ten out of ten."

Novak said one of the nurses at the hospital convinced the victim to open her mouth. The nurse saw a large stick in the back of the victim's mouth. Novak saw the nurse pull out part of the stick, which was approximately four inches long. The victim was taken into surgery immediately to have the remaining part of the stick removed.

On cross-examination, Novak agreed that the victim's only complaint was her mouth and that he noticed no other trauma. He said that when the victim was standing against the patrol car at the scene, she told the paramedics "that she had been raped and beaten fifteen minutes ago."

Memphis Police Sergeant Tim Murphy testified that he responded to a call regarding an incident at a vacant lot at the intersection of Willie Mitchell Boulevard and Olive Avenue. The crime scene unit was at the scene when he arrived. During a search of the

scene, the police found a pair of women's underwear, a pair of gold-colored earrings, a pair of sunglasses, three keys, a black ball cap, a piece of a black hair weave, and two gold-colored shoes. The police also found a stick that was "maybe six to eight inches, ten inches long, maybe a little bit thicker than your thumb or about the size of your thumb. . . . There was a little bit of blood on the end of it."

Sergeant Murphy said they knocked on doors in the area and eventually found someone who had heard a woman yelling. Sergeant Murphy also learned that Officers Gerard and Lawson had seen a suspect running in the area. About 6:00 p.m., Salvador Taylor "flagged down" the officers. Taylor told the officers that he had been assaulted by a black male "near Lathan and South Parkway." Taylor had scratches on his neck and knuckles, and the officers took his information.

On cross-examination, Sergeant Murphy said that the officers who saw Taylor said that he matched the description of the perpetrator and had scratches on his knuckles and his neck. On redirect examination, Sergeant Murphy said that the only description the police had of the perpetrator was that he was "an African-American male in dark clothes."

Judy Pinson, an expert in sexual assault examination, testified that in May 2014, she was working as a sexual assault nurse examiner at the Memphis Sexual Resource Center. Pinson went to the hospital and spoke with the officers who were there with the victim. The officers reported that they responded to a disturbance call and found the victim, who was not wearing pants or underwear, in a wooded area. The victim told the officers that she had been raped. They also advised Pinson that a stick was lodged in the victim's mouth and throat. A nurse in the trauma unit told Pinson "they thought [the victim] was dying when she came in."

Pinson attempted to speak with the victim; however, the victim could not respond because she was intubated and was medicated. The victim's mother and aunt gave consent for an examination and advised Pinson that the victim "was mildly developmentally delayed."

At the beginning of the examination, Pinson asked the victim if she had been raped, and the victim responded by nodding. The victim was lying in bed and was wearing a cervical collar. Her hair was "very mussed" and "had a lot of leaves in it." Pinson took photographs of the victim, which were shown to the jury.

Pinson said that during the examination, she saw a blade of grass on the victim's external genitalia. Pinson did not see any cuts, abrasions, or bruising, which she explained was not unusual in a rape case. Pinson swabbed the victim's vaginal, vulva, and anal areas and put the swabs in a rape kit.

On cross-examination, Pinson agreed that her findings were also consistent with someone who had consensual sex.

Dr. Cory Evans testified that he was a trauma surgeon and that he saw the victim when she arrived at the hospital in critical condition. The victim had a stick lodged in her throat and several small cuts covering her body. The victim was taken into an operating room, and the stick was removed. Dr. Evans said that the stick had injured the roof of the victim's mouth, her tongue, and the area below her tongue.

Dr. Evans said the victim was sedated and intubated for five days. Dr. Evans explained that the sedation could have resulted in retrograde amnesia which could have caused the victim to forget the trauma. After the breathing tube was removed, the victim developed an abscess in the back of her throat, and it had to be surgically drained. The victim was discharged from the hospital on May 14.

Dr. Evans said that if the stick had been removed from the victim's throat outside of the hospital, her airway could have swollen shut and left her unable to breathe. Dr. Evans said the stick was lodged near the victim's carotid arteries, the main blood vessels to the brain. Dr. Evans said that the "stick had actually penetrated the throat tissue, the skin of the throat, and went back into what's behind the skin."

On cross-examination, Dr. Evans said that the victim was seen by a hospital psychiatrist. Dr. Evans had reviewed the records pertaining to the victim's hospitalization. The records reflected that the victim's mother reported that the victim "'has been to MMHI [Memphis Mental Health Institute] times two. Last time was approximately one year ago for auditory and visual hallucinations.'" The record also reflected that the victim was placed on medication for the hallucinations but that she stopped taking the medication. The victim's mother explained, "[W]e did not want her on any crazy-ass pills."

Special Agent Donna Nelson with the Tennessee Bureau of Investigation (TBI) Crime Laboratory testified that she received the rape kit containing the victim's vaginal, vulva, and anal swabs. She also received underwear and two sticks.

Special Agent Nelson said that she tested the vaginal and anal swabs. She did not test the vulva swabs because they were collected very close to the area where the vaginal swab was collected. Special Agent Nelson found spermatozoa on the vaginal and anal swabs. The DNA from the spermatozoa matched the Appellant's DNA.

On cross-examination, Special Agent Nelson agreed that testing would not reveal how long DNA had been in a particular place. Special Agent Nelson further agreed that she did not test the underwear or the sticks for DNA.

On redirect examination, Special Agent Nelson explained that she would have tested the underwear and sticks had she deemed it necessary; however, further testing was unnecessary after she found DNA on the swabs.

Memphis Police Lieutenant Byron Braxton testified that in May 2014, he was involved in the investigation into the crimes against the victim. The police canvassed the area surrounding the crime scene for potential security video but found none. They also solicited "Crimestoppers' tips" and followed up on them. Photographs of some of the individuals mentioned in the tips were placed in photograph lineups and shown to the victim. The only person the victim could identify was a person with whom she had a prior relationship; however, she said the person had nothing to do with the crimes. Lieutenant Braxton was aware that Taylor had flagged down the police the night of the crimes and reported that he had been attacked by someone. Lieutenant Braxton put Taylor's photograph in a lineup, but the victim was unable to identify anyone.

Lieutenant Braxton said that after learning the Appellant's DNA had been found on the vaginal and anal swabs from the victim, he created a lineup that included the Appellant's photograph. When the victim viewed the lineup, she did not identify the Appellant.

On cross-examination, Lieutenant Braxton said that when he spoke with the victim, she was not disoriented, but she had stitches under her tongue, was in pain, and could not talk. Lieutenant Braxton did not think the victim appeared to be "low functioning." Lieutenant Braxton said that while viewing the photograph lineups, the victim described the man who lured her outside as "'black and young. Marcus or Marius.'"

The State rested its case-in-chief, and the Appellant made a motion for judgment of acquittal, which was denied by the trial court. The Appellant did not present any proof. The jury convicted the Appellant of attempted second degree murder, aggravated rape, and rape.

At the sentencing hearing, the trial court merged the rape conviction into the aggravated rape conviction. The trial court sentenced the Appellant to twenty-five years for the aggravated rape conviction and twelve years for the attempted second degree murder conviction. The trial court ordered that the Appellant serve the sentences consecutively for a total effective sentence of thirty-seven years in the Tennessee Department of Correction.

## **II. Analysis**

### A. Motion to Dismiss the Indictment

First, the Appellant contends that the trial court erred by denying his motion to dismiss the indictment. [1] The State responds that the trial court did not err. We agree with the State.

On November 6, 2015, the Appellant filed a motion to dismiss the indictment pursuant to Tennessee Rule of Criminal Procedure 5, alleging that he was denied his right to a preliminary hearing. At the December 11, 2015 hearing on the motion, defense counsel cited Tennessee Rule of Criminal Procedure 5(e)(4),[2] which provides:

> If an indictment or presentment is returned against a defendant who has not waived his or her right to a preliminary hearing, the circuit or criminal court shall dismiss the indictment or presentment on motion of the defendant filed not more than thirty days from the arraignment on the indictment or presentment. The dismissal shall be without prejudice to a subsequent indictment or presentment and the case shall be remanded to the general sessions court for a preliminary hearing.

Defense counsel explained that the Appellant's case was first set for a preliminary hearing on October 16, 2015. On the day of the hearing, the State notified defense counsel that it was unable to proceed because multiple witnesses were unavailable. Defense counsel agreed to reset the hearing for November 5; however, on the morning of the hearing, the State informed defense counsel that the victim was unavailable to testify. According to defense counsel, the State suggested that the Appellant move to dismiss the case. Defense counsel moved to dismiss the case for "lack of prosecution," and the motion was granted around 11:00 a.m. The next day, defense counsel learned that the Appellant had been indicted the same day the case was dismissed.

Defense counsel complained that the State had acted in bad faith by urging the Appellant to dismiss the case in general sessions court, which effectively denied the Appellant his right to a preliminary hearing. Defense counsel argued that Rule 5 prohibited the State from presenting the case to the grand jury prior to the dismissal of the charges unless the Appellant had waived his right to a preliminary hearing. Defense counsel alleged that the State was trying to "circumvent [the Appellant's] rights" to a preliminary hearing. Defense counsel noted that the Appellant had been incarcerated since June 18th and that she had been "trying to get the case moving."

---

[1] Judge John W. Campbell presided over the pretrial motions. Judge Lee V. Coffee presided over the trial.

[2] "The provisions of former Rule 5(e)(4) are now found in subsection (f)(4)." State v. Michael Green, No. E2018-00350-CCA-R3-CD, 2019 WL 2714490, at *13 (Tenn. Crim. App. at Knoxville, June 28, 2019).

The prosecutor responded that she was appointed to the case after the October 16 hearing and did not know what occurred at that hearing. She explained that on November 5, the State's investigator went to the victim's home to drive the victim to court, but the victim was not at home. The prosecutor said that she informed defense counsel that the victim was not at home, and that the State could make another attempt to find the victim that day, or the preliminary hearing could be reset to another day. The prosecutor also suggested that another option was for trial counsel to move to dismiss the case. Defense counsel decided to ask the court to dismiss the case, and the general sessions court granted her motion. The prosecutor said that she waited in the clerk's office until the order of dismissal was filed and then obtained a printout showing that the case was dismissed at "eleven twenty-something." The prosecutor said, "I had conversations with Grand Jury personnel about how, you know, I was up there, the case had been dismissed, and we had about an hour left until the Grand Jury probably broke for the day, and we needed to call the investigator down to present the case." The prosecutor said that, accordingly, "the case was presented after it was dismissed downstairs." The prosecutor argued that the Appellant's right to a preliminary hearing was not violated because his case was dismissed on the Appellant's own motion, and at that point, the State was free to seek an indictment. The prosecutor explained that the State had moved quickly to keep "a violent, dangerous person" in custody.

Defense counsel stated that she did not recall the State's offering to reset the preliminary hearing. Defense counsel said she had not seen the document the State maintained was proof that the case was dismissed around 11:00 a.m.

The trial court noted that most cases interpreting Tennessee Rule of Criminal Procedure 5 involved a situation in which the State had purposely dismissed a case in order to avoid a preliminary hearing. The trial court found that in this case, the State did not engage in "any inappropriate behavior" such as dismissing the case to avoid a preliminary hearing, withholding evidence, or hiding witnesses. Further, the trial court found no evidence to suggest that the victim actually was available and that the State "just decided not to present" her. The trial court found that the motion to dismiss was made by the Appellant, not the State; accordingly, the Appellant was not entitled to a dismissal of the indictment.

We note that in Tennessee, a preliminary hearing is not constitutionally required; however, it is a critical stage of a criminal prosecution that is mandated by law. State v. Whaley, 51 S.W.3d 568, 570 (Tenn. Crim. App. 2000) (citing Moore v. State, 578 S.W.2d 78, 80 (Tenn. 1979)). Specifically, Tennessee Rule of Criminal Procedure 5(f)(1) provides that "[a]ny defendant arrested or served with a criminal summons prior to indictment or presentment for a misdemeanor or felony, except small offenses, is entitled to a preliminary hearing." The primary functions of a preliminary hearing are "to determine whether probable cause exists to believe that the accused committed the offense charged and to fix

the amount of bail for bailable offenses." Whaley, 51 S.W.3d at 570 (citing Tenn. R. Crim. P. 5.1; State v. D'Anna, 506 S.W.2d 200, 203 (Tenn. Crim. App. 1973)).

This court has explained that "[g]enerally, the state may seek an indictment by the grand jury subsequent to a dismissal of a warrant and prior to a preliminary hearing, and the indictment starts a new proceeding." Id. (citing Waugh v. State, 564 S.W.2d 654, 660 (Tenn. 1978)). Regardless, "the state is precluded from pursuing a grand jury indictment when it, 'acting in bad faith, effectively denies the accused a preliminary hearing.'" Id. (quoting State v. Golden, 941 S.W.2d 905, 908 (Tenn. Crim. App. 1996)). This court has explained that "[b]ad faith may be defined as the state of mind involved when one is not being faithful to one's duty or obligation." Golden, 941 S.W.2d at 908 (citing Black's Law Dictionary 693 (6th ed. 1990)). A prosecutor's duties are to be (1) "the guardian of the State's interest" and (2) "the protector of the rights of the accused." Id. In carrying out these duties, a prosecutor

> may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods as it is to use every legitimate means to bring about a just one.

Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

First, the Appellant questions whether the indictment was obtained before the case was dismissed in general sessions court, essentially claiming that the State acted in bad faith. The Appellant appears to focus primarily on the timing of the State's effort to obtain the indictment. The trial court accredited the prosecutor's statement that she offered to attempt to find the victim, reset the preliminary hearing to another date, or, in the alternative, the Appellant could ask the court to dismiss the case. The trial court found that the case was dismissed in the general sessions court before the State sought an indictment against the Appellant. See Waugh, 564 S.W.2d at 660. We conclude that the trial court did not err by denying the Appellant's motion to dismiss the indictment. Defense counsel should have been aware that once the initial prosecution against the Appellant ended, the State was free to seek an indictment against the Appellant.

B. Motion to Quash the Subpoena Duces Tecum

At the December 11, 2015 hearing, defense counsel said that following the dismissal of the original case and the subsequent indictment of the Appellant, she obtained a subpoena duces tecum, seeking records from the District Attorney General's office. On the morning of the hearing, the State filed a motion to quash the subpoena, contending that the Appellant was "seeking to subpoena work product" which was not discoverable under Tennessee Rule of Criminal Procedure 16.

Defense counsel responded that she had not asked for the district attorney's work product; her only request was for information regarding the specific time the case was presented to the grand jury. The trial court responded that it thought the requested materials were

> work product, what they generate, what the District Attorney's office generates, and I don't know what they generate down there as far as when a matter is presented.
>
> I know there's a book they write all the information in. Other than that, I'm not aware of them putting times in the book. I know they put in the date of the return as well as the indictment number once it's been given to them by the clerk. But, other than that, I don't – I'm not aware of anything else.

Accordingly, the trial court granted the State's motion to quash the subpoena.

On appeal, the Appellant contends that the trial court "erred by quashing the [Appellant's] subpoena of the District Attorney's records concerning the time that [the Appellant's] case was presented before the Grand Jury when the case was presented to the Grand Jury on the same date that the preliminary hearing on the case was scheduled to be conducted in general sessions court." The State contends that the information sought by the Appellant was the State's internal work product and not subject to discovery.

Initially, we note that the subpoena is not included in the record for our review; therefore, we are unable to address the issue. The Appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## C. Victim's Mental Health

The Appellant contends that the trial court erred by denying his request to review the victim's mental health records. The Appellant asserts that the records "would provide support for the theory that the victim has a history of auditory and visual hallucinations that may have affected her testimony concerning the events of May 2, 2014." The Appellant further asserts that the victim's history of hallucinations and the fact that she stopped taking medication prescribed to treat the hallucinations were relevant "to determining the credibility of the victim's account of whether she engaged in consensual

sex with [the Appellant] earlier that day prior to the assault that occurred that night." The State responds that the trial court correctly held that the Appellant was not entitled to the records. We conclude that the trial court erred but that the error was harmless.

The Appellant filed a "Motion for Production [of] Medical and Psychiatric Records for *In Camera* Inspection Prior to Trial." The Appellant requested that the trial court "order the production of medical and psychiatric documents with regard to the alleged victim in this cause, and any other prior or subsequent records which involve the alleged victim in this case, for *in camera* inspection by the Court to determine whether those records may be copied by the [Appellant]" pursuant to the rules of discovery. The Appellant noted that he had received the medical records for the victim's hospitalization for the injuries in this case and that the hospital records indicated that the victim had a history of neurocognitive disorder and mental retardation, that she had been admitted to "Lakeside," and that she was "on psychiatric medications." The Appellant maintained that the victim's prior mental health records were relevant and material to his defense

> because neurocognitive disorder, and any other psychiatric diagnoses, bears directly upon [the victim's] credibility as a witness. Namely, it bears upon her ability to form coherent thoughts at the time of the alleged events, free from delusion and psychosis, and bears upon her ability to sustain accurate memories of those events. Co-occurring disorders of drug addiction, neurocognitive disorder, and any other psychiatric disorders would further affect those abilities and her credibility as a witness at trial.

At a pretrial hearing on the motion, defense counsel explained that she was asking the trial court to review the victim's psychiatric records that were mentioned in the hospital records. The State acknowledged that the hospital records referenced a history of hallucinations and other mental health issues about which the State had no information. The State did not object to the trial court's reviewing the psychiatric and mental health records but did not concede the records included any relevant information. The trial court granted the motion and agreed to review the mental health records in camera.

At a subsequent hearing, Judge Campbell stated that he had reviewed the mental health records and asked defense counsel to clarify her arguments regarding the relevance of the records. Defense counsel said the hospital records reflected that the hospital staff thought the victim had "psychological issues going on for quite a bit of time" before the offenses. Defense counsel asserted that the Appellant needed to know if the victim had prior mental health issues and if those issues affected "the potential competence of the witness."

- 13 -

The trial court responded that it had examined the mental health records and did not "see any issue of competence." The trial court observed, "Based on the [hospital] records when she was treated for this injury, she was treated for a horrific injury." The trial court said that "the fact that there was some emotional issue there, there's nothing in the record, in my opinion, that gives rise to any indication that she was not competent or that she was in some kind of serious psychological distress that would, in my opinion, make her mental history relevant." The trial court stated that it was "not inclined to release any of that information."

Defense counsel clarified that the hospital records reflected that the victim's reactions were "inappropriate" and that she was "smiling or laughing when trying to recall the events." As a result of the victim's behavior, medical personnel called for psychological assistance. The trial court reiterated that it had seen nothing in the subpoenaed mental health records that justified releasing them to the defense. The trial court said, "I didn't see anything in there that indicated there was any long-term treatment or there was any additional – there was no medications or anything like that were prescribed for any type of mental illness." The trial court said, "[The defense] has the medical records, the physical records. I don't see where the mental health side of it really adds anything, so I'm not going to release them." The trial court ordered that the victim's mental health records be placed under seal.

Initially, the State contends that the Appellant's argument is that he personally should have been permitted to review the victim's mental health records and that the issue is waived because he failed to raise it in the trial court. However, the State has misconstrued the Appellant's argument. The Appellant has consistently argued that the trial court should perform an in camera inspection of the records first to determine if any of the mental health records contained anything relevant to the victim's credibility. Therefore, he has not waived the issue.

As the State notes, the victim has a right to confidentiality in her mental health records. See Tenn. Code Ann. § 10-7-504(13). However, the Appellant has the right to review records with exculpatory information to prepare for his defense. See Pennsylvania v. Ritchie, 480 U.S. 39, 57-58 (1987). The trial court must balance these concerns and review the records in camera before determining whether the records should be provided to the defense. See Tenn. Code Ann. § 33-3-105(3). In the instant case, the trial court followed the proper procedure but construed the Appellant's argument solely as an issue of competency. The trial court failed to address the argument raised in the Appellant's motion, which was whether the records contained anything relevant to the victim's credibility.

Our review of the sealed records reveals two separate documents that show the victim went to a hospital seeking medical treatment on two occasions prior to the offenses. According to the first document, which was dated April 18, 2012, the victim went to

- 14 -

Regional Medical Center complaining of "hallucinations, agitation, and trouble concentrating." At that time, the victim's mother also told medical staff that the victim had "hallucinat[ed] about seeing the devil and other things in the sky." According to the second document, which was dated June 24, 2013, the victim went to Regional Medical Center's emergency room because of a headache. She also reported having auditory and visual hallucinations and told medical staff that "someone put a spell on me today which gave me a headache."

The Appellant's defense was that he had engaged in consensual sex with the victim earlier on the day of the offenses and that he was not responsible for the injuries to the victim later that night. The Appellant argued that the victim's history of audio and visual hallucinations, her failure to take her medication, as well as her being sedated, were relevant to the reliability or credibility of her memories of the events. A victim's psychological history may be relevant to a defense raised by a defendant. State v. Jeffrey R. Allen, No. 03C01-9708-CC-00367, 1999 WL 5173, at *4 (Tenn. Crim. App. at Knoxville, Jan. 8, 1999). Based on the Appellant's defense and the unusual nature of the victim's recollection of the encounter, we conclude that some of the victim's mental health records were relevant to her credibility and that the trial court should have allowed the defense to review the relevant records.

Nevertheless, the victim's hospital records were provided to the defense in discovery. According to a physician's handwritten notes in the records, on May 12, 2014, the victim's mother, who was at the victim's bedside, advised medical personnel that the victim had been to MMHI twice and that "the last time was apparently 1 year ago for auditory and visual hallucinations." The victim's mother also advised medical personnel that the victim was "placed on medications but . . . 'we did not want her on crazy ass pills.'" Therefore, we conclude that the victim's hospital records contained information about the victim's history of auditory and visual hallucinations and contained information about her failure to take medication that had been prescribed for those hallucinations. As will be discussed below, at trial the defense even tried to question the victim in a jury-out hearing about her history of hallucinations and her failure to take medication prescribed for them. Accordingly, although the defense was not privy to the details of the victim's hallucinations which were contained in the psychological records, the defense nevertheless was aware of the fact that the victim suffered hallucinations and made the jury aware of that fact. Therefore, because the details of the hallucinations could not have changed the outcome of the trial, the trial court's error was harmless.

In a related issue, the Appellant contends that "the trial court erred by suppressing during a jury-out hearing the victim's testimony concerning her prior mental health history of visual and auditory hallucinations and her failure to take the prescribed medication for the problem." The Appellant maintains that "the defense should have been allowed to explore evidence of the victim's history of visual and auditory hallucinations as documented in the victim's medical records" and the offer of proof. The Appellant asserts

- 15 -

that "[t]he evidence in question was relevant for impeachment purposes; to aid in the determination of the credibility of the victim's account of what occurred and to aid in explaining why the victim did not recall engaging in consensual sex with [the Appellant]." The State responds that the victim said twice during her testimony that her hallucinations began only after the offense; therefore, the trial court did not abuse its discretion by finding the evidence was irrelevant and overly prejudicial. Again, we conclude that the trial court erred but that the error was harmless.

On cross-examination, defense counsel asked the victim if she talked to a psychiatrist during her hospitalization and if she told the psychiatrist about "some of the problems" she was having. The State objected, arguing that Judge Campbell had determined that the victim's mental health records were not relevant and, therefore, were not admissible. The State asked that the trial court

> limit the amount of questions that [defense counsel] gets to ask about those records. Those psych records, her psych history, . . . I want to limit the amount of questions that are asked about whatever psych history she may or may not have. Judge Campbell has already looked at that and said that it was not relevant.

The State said, "I don't have an objection to asking her if she talked with a psychiatrist at the hospital about the effects of this particular incident on her mental health. . . . But, as far as the big picture of her psych history, Judge Campbell has already ruled that that's inadmissible."

Defense counsel countered that Judge Campbell

> did not rule that the psych records were inadmissible. I subpoenaed extra records outside of what we already had concerning her medical records because we did receive a large package of information from the hospital. So I was asking for additional psychiatric med records based on those notes that were found in that medical package. Obviously, I can't ask her what the doctors' notes are. She's not a doctor. But it goes to her state of mind and what her limitations are, and how they affect her ability to recall information.

The State asserted that the victim had "testified that she doesn't have developmental delays." Defense counsel responded, "And I've not asked her anything more than that."

The trial court stated:

I obviously don't know what rulings Judge Campbell has made, but, whatever the rulings are, Judge Campbell reviewed these records, I presume.

. . . .

If the judge has indicated that he did not think it's relevant – and I don't know how her medical psychiatric history would be relevant to any issues that this jury has to determine in this case as to whether or not she was raped or not. And she's indicated she does not have any developmental delay issues.

If she spoke to a psychiatrist in the hospital about any trauma that may have happened to her, you may certainly ask those questions. But, if the judge – and I have not reviewed the findings that Judge Campbell has made. I know there are sealed records in this file. I don't know, if there is a mental history, how it would be relevant for this case.

Defense counsel responded that the victim's mental health was relevant to "her ability to testify." The trial court stated:

If you believed that she was incompetent to testify, that's something that Judge Campbell should have heard once a proper motion was filed, and Judge Campbell would have made the decision as to whether or not he believed that she was capable of taking an oath and understanding the solemnity of the oath. That's something that should have been addressed pretrial.

Defense counsel clarified that Judge Campbell "did not rule that the medical records that we had already received were inadmissible. He did not say that." The State acknowledged, "No. I know." Defense counsel maintained that Judge Campbell ruled that she could not receive the additional mental health records she had requested. Defense counsel contended, however, that in the victim's hospital records

there is some medical history there that says that she has delusions [inaudible], and I just want to be able to question her about those things. If she doesn't remember, she doesn't remember. But I don't think there's anything in the rules that says that I can't ask her about her state of mind, and she admits to seeing the psych department.

- 17 -

The trial court said that it would allow defense counsel to make an offer of proof out of the presence of the jury. During the proffer, defense counsel asked if the victim recalled being seen by "the psych doctors," and the victim said that she did. The victim explained that she thought "psych doctors" were doctors who "deal with anything." The trial court interrupted defense counsel's questioning and asked the victim if she spoke with a psychiatrist in the hospital. The victim responded that she had spoken with "everybody" and had "probably" spoken with a psychiatrist.

Defense counsel resumed questioning the victim and explained that a psychiatrist was a doctor who addressed mental health issues, and the victim agreed that she understood. Defense counsel asked if the victim recalled speaking with a psychiatrist about her "disorders," such as "low functioning, developmental delay." The victim said no. She acknowledged, however, that she had spoken with a doctor about hallucinations she was having. She further acknowledged that she was prescribed medication for the hallucinations, but the medication made her sick and did not stop the hallucinations, so she stopped taking it. She maintained that she "was trying to get help for that." Defense counsel wanted to know "what kind" of hallucinations the victim experienced, and the victim answered, "Seeing stuff that's not there."

The victim told defense counsel that she was not prescribed medication before she was in the hospital, that she was only given the medication to take while she was in the hospital, and that she was not given any of the medication to take at home. Defense counsel asked if the victim had "hallucinations before this," and the victim said no. The victim denied that she ever went to "MMHI" but said that she had "stayed in – up in whatever hospital that they gave me the medication for." Defense counsel asked if she was "talking about this incident or before," and the victim responded, "I've been having it for a little while. It didn't even happen for the accident." When asked if she had hallucinations before "this accident," the victim replied, "I didn't have no hallucinations. I had the hallucinations, not in this accident, but I have a hallucination, like, first, and then the accident had happened." Defense counsel asked, "So you had hallucinations . . . when the accident happened. Right?" The victim responded, "Yeah, but I didn't know the accident would happen like that."

At that point, the following colloquy occurred:

> [The trial court:] Do you understand [defense counsel's] question right now? And if you don't, remember I told you, if you don't understand the question, let me know, and we'll ask a better question. Okay?
>
> [The victim:] Okay.

[The trial court:]  Now, what [defense counsel] is asking, did you ever see any doctors before this accident happened?

[The victim:]  I mean, I had went to one of them doctors that you stay – like, stay in, for them to give me some medication for the hallucinations.

[The trial court:]  That's before this happened?

[The victim:]  Yeah, before.

[The trial court:]  Do you [re]member how long before this happened[?]

[The victim:]  I don't know what year it was.

[The trial court:]  [W]hen you say "hallucinations," what kind of hallucinations were you having?

[The victim:]  Like, seeing things that's not there and hearing things that's not there.

[The trial court:]  And you were supposed to have gotten some medicine for that?

[The victim:] Yes.

[The trial court:]  And you did not take a medicine?

[The victim:]  No.

[The trial court:]  Because it didn't help, and it made you throw up?

[The victim:]  Yeah.  'Cause I had went to the bathroom, and I throwed (sic) it back up, and they make me took it over again.

[The trial court:]  Now, was that happening while you were in the hospital from what happened to you when you got knocked out, or was it happening before then?

[The victim:]   It didn't happen when the accident had happened.

- 19 -

[The trial court:]  It happened when the accident had happened?

[The victim:]  No.  It didn't happen.

[The trial court:]  It didn't happen when the accident happened. So it happened before the accident?

[The victim:]  Before?

[The trial court:]  Yes, ma'am.  When you woke up in the hospital – okay?

[The victim:]  When I woke up in the hospital . . .

[The trial court:]  You told me you don't remember what happened after this man was in your face, but you woke up in the hospital, and you got knocked out?

[The victim:]  Yes.

[The trial court:]  Okay.  Now, before that – before that, were you given any medications for having hallucinations?

[The victim:]  No.

[The trial court:]  Were you thinking about things or seeing things that happened before you got knocked out and sent to the hospital?

[The victim:]  No.

[The trial court:]  So those things happened after you got knocked out and you woke up in the hospital?

[The victim:]  Yes.

Defense counsel resumed her questioning and asked the victim if she remembered going to Lakeside.  The State objected to the question, contending, "These are specifically the records that Judge Campbell has seen and that Judge Campbell said were irrelevant."  Defense counsel said that the reference to Lakeside was in the victim's hospital records, which the defense received during discovery.  The State argued:

- 20 -

But references to MMHI and Lakeside in the Regional One records, we should not be going into in front of the jury. Judge Campbell has already said that what happened at MMHI and Lakeside is irrelevant. So references to her trips to MMHI and Lakeside, whether they happened or not, should not be coming in in front of the jury.

Defense counsel stated that Judge Campbell had not ruled

that they were irrelevant, that my getting additional records from what has already been included in the consent order for the patient's medical records from her time concerning this incident at Regional One, then The Med, are the ones by which I am referring my questions. I'm not asking about any additional records. These are records by which the State already consented to.

The trial court said:

[I]t's difficult when you inherit a case in which another judge has already made rulings on. But, if I were in Judge Campbell's position, I would not admit – if I reviewed records from MMHI and Lakeside, any prior records. Psychological records on a victim [are] not admissible in a trial unless there's some overwhelming need or some overwhelming reason to overcome the confidentiality of those records.

Judge Campbell has reviewed them. He has made a decision that it's not relevant, not admissible. If there is something in the records from Regional One Medical Center, or whatever it is called now, that made reference to those records, it still does not create a back door way of getting into records that Judge Campbell has already indicated [are] not relevant or admissible, but I will allow you to develop this record outside of the presence of the jury, and I'll make a decision as to whether or not some of those questions can be asked in the presence of the jury.

At that point, defense counsel asked the victim if she had ever been seen at Lakeside. The victim said, "I stayed on Silver Age." The trial court interrupted defense counsel and, thinking the victim did not understand the question, asked the victim if she had ever been in the hospital for mental problems. The victim replied, "I've never been there before. It was my first time when I had went there for hallucinations." The trial court asked if the

victim went to the hospital "[f]or this accident, when you were being treated, after you got knocked out?" The victim responded affirmatively. The trial court asked if the victim had ever gone to another hospital to be treated for hallucinations, and the victim said no.

After the offer of proof, the trial court stated:

> For the record, again, I'm not privy to those records that Judge Campbell reviewed, but he reviewed them. He ordered that those records be sealed. . . . So, whatever is in those records that Judge Campbell looked at and decided they would be sealed and would not be admissible, this Court affirms the ruling of Judge Campbell, because there's nothing that is before the Court – if there are any records, and [the victim] has indicated she's never been treated for any psychological problems, never had any hallucinations, until she woke up in the hospital after having been knocked out and having blacked out.

Defense counsel objected to the trial court's restatement of the victim's testimony, asserting, "I specifically remember you asking her, after I asked her, did she [have] these hallucinations before. And she said before the accident. She said that several times." The trial court abruptly interrupted defense counsel, stating, "No, ma'am. That's not what she said. That's why I got a clarification of it, [defense counsel]. Your recollection may be different from mine, but the record will speak for itself." The trial court warned defense counsel, "Don't argue with me in the middle of this ruling." The trial court told defense counsel to "[h]ave a seat" and cautioned her that if she "continue[d] this conduct, I'm going to hold you in contempt of court."

The trial court then stated, incorrectly, that after "a clarification," the victim told the court that she

> had never been prescribed medications before this, had no hallucinations before this accident, never was treated at any hospitals or any mental health issues before this accident. That is what she just told the Court.

> Your recollection may be different, but this is what my ruling is, and this Court will not allow any of these questions to be asked in front of the jury. This is character proof for which there is no basis. There is no good faith basis for this. Judge Campbell has already ruled on these records not being admissible, and to allow you to come in a back door to

- 22 -

circumvent a ruling by another judge is improper, and it will
not be discussed in front of this jury.

On appeal, the Appellant argues that "he should have been allowed to explore evidence of the victim's history of visual and auditory hallucinations as documented in the victim's [hospital] records." We note that the propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Further, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008). Generally, a trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id.

In this case, the trial court found that the victim testified that she never experienced hallucinations prior to the assault that resulted in her hospitalization. Based on that finding, the trial court ruled that defense counsel could not question the victim about her history of hallucinations. However, the trial court's finding was incorrect. The victim testified that she experienced auditory and visual hallucinations sometime prior to the crimes but that she "[did not] know what year it was." Moreover, had the trial court bothered to review the victim's sealed medical records, the court would have seen that the victim experienced hallucinations in 2012 and 2013 and had sought treatment.[3]

The victim also testified during the offer of proof that she was prescribed medication for the hallucinations. She said that she stopped taking the medication but said repeatedly that she did not experience hallucinations on the day of the "accident." In our view, the victim's history of hallucinations and her failure to take medication that had been prescribed for those hallucinations were relevant to her ability to perceive what occurred on the day of the assault and were relevant to her credibility that she was not hallucinating that day. See People v. Flowers, 862 N.E.2d 1085, 1090 (2007) (stating that although "Brooks denied that he was hallucinating on the day of the shooting, it could be argued that the records would be admissible to show that he had complained of hallucinations in the past—a fact that would seem relevant not only to Brooks's ability to perceive the occurrences about which he testified, but also as to the credibility of his testimony that he

---

[3] We are perplexed that the trial court failed to review the sealed records when the issue arose during trial, particularly in light of the Appellant's theory of defense and the victim's testimony during the offer of proof. This court has previously stated that "[i]nterlocutory orders of a trial court are subject to reconsideration before the litigation is complete, including the power of a successor judge to reverse the order of the previous judge." State v. Jeremy Randall C. Ledbetter, No. M2018-00846-CCA-R3-CD, 2020 WL 853733, at *24 (Tenn. Crim. App. at Nashville, Feb. 20, 2020). Therefore, the trial court should have reviewed the records.

was not hallucinating on the day of the shooting when compared with his statement to the investigator"). Thus, we conclude that the trial court erred by not allowing defense counsel to question the victim. See State v. Barnes, 703 S.W.2d 611, 617-18 (Tenn. 1986).

Having found error, we must determine the effect of the error. On cross-examination, the Appellant questioned Dr. Evans about the victim's hospital records, which were submitted as an exhibit at trial. Dr. Evans testified that the records contained the information that on two occasions, the victim had been to a hospital reporting auditory and visual hallucinations. He further testified the records also contained the information that the victim's mother said the victim stopped taking her medication for the hallucinations because "we did not want her on any crazy-ass pills." During closing arguments, defense counsel asked the jury to review the victim's medical records. Additionally, the Appellant's DNA linked him to the crimes. Finally, the computer-generated drawing based upon the victim's descriptions of the man who came to her door before the assault was made shortly after the assault and strikingly resembled the Appellant. See State v. Michael D. Hernandez, No. E2015-01365-CCA-R3-CD, 2016 WL 5416359, at *9 (Tenn. Crim. App. at Knoxville, Sept. 27, 2016); State v. Michael Presson, No. W2012-00023-CCA-R3-CD, 2014 WL 1669860, at *33 (Tenn. Crim. App. at Jackson, Apr. 24, 2014) (citing State v. Carroll, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999)). Allowing cross-examination of the victim on this issue regarding the records would not have changed the outcome of the trial; therefore, we conclude that the error was harmless.

## D.  Ferguson

The Appellant contends that the trial court erred by failing to dismiss the charges against him or, in the alternative, give an instruction to the jury because the State failed to preserve potentially exculpatory evidence as mandated by State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). The State argues that the trial court did not err by refusing to dismiss the charges or give the instruction. We agree with the State.

During the State's direct examination of Officer Sanders, Officer Sanders testified about photographs he had taken at the scene. Notably, Officer Sanders said that one photograph showed "[e]vidence placard number five, a tree branch or a stick with what appears to be a dry red substance on that stick." Without objection, the photograph was admitted as exhibit 14. The trial court described exhibit 14 as a photograph of "placard number five, described by Officer Sanders as showing a stick with what appears to be dried or red blood on the stick." Officer Sanders described the next exhibit as "[a] photograph of the same stick with a dry red substance appearing to be blood." Officer Sanders pointed out on the photograph where the "possible blood" was located on the stick.

As his direct examination continued, the State asked Officer Sanders to remove the stick from an evidence bag. At that point, the parties discovered that the stick recovered at the scene was missing. During a jury-out hearing, Officer Sanders assured the trial court

that he had collected the stick, "tagged" it, and taken it to the police department's property room. The other items Officer Sanders collected from the scene were in the evidence bags.

The State insisted that the stick recovered at the scene was never sent to the TBI for testing to determine whether the substance was blood, and the State did not know what had happened to the stick after it was taken to the property room. The State asserted that the stick was not a critical piece of evidence. Defense counsel contended that she was concerned because the jury had seen photographs of the stick and had heard testimony that the red substance on the stick possibly was blood; however, without testing, the substance could not be confirmed to be blood.

The trial court accredited Officer Sanders' testimony that he collected the stick at the scene because the substance on it might be blood, tagged it, and took it to the property room. The trial court further accredited Officer Sanders' testimony that he did not know prior to his testimony that the stick was missing. The court noted that items had been lost from the property room on other occasions. The trial court said that a lay witness, such as Officer Sanders, could give an opinion that a substance appeared to be blood.

The trial court found that the defense had failed to articulate any of the factors set out in Ferguson that would require the court to dismiss the case. The court found that the State did not have a duty to preserve the stick because no evidence indicated it had exculpatory value or that it was significant to the defense. The court noted that the stick at the scene "allegedly, by inference," was part of the stick that was in the victim's throat. However, during the three and one-half years the case had been pending, neither side sought to have the stick tested or indicated it was central to the defense. The court further found that the State had "simply lost [the] evidence" and that there was no proof the State had intentionally lost or destroyed the evidence. The trial court also held that a Ferguson instruction was not warranted. The court said that the Appellant's ability to put on a defense was not hampered by the loss. Regarding the instruction requested by defense counsel, the trial court said it was not supported by the record.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Thus, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed "the factors [that] should guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory." 2 S.W.3d at 914. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. "For this duty to arise, the [evidence] must be expected

- 25 -

to play a significant role in [the Appellant's] defense." State v. Merriman, 410 S.W.3d 779, 792 (Tenn. 2013). "Specifically, [the evidence] must have potential exculpatory value and be of such a nature that [the Appellant] would be unable to obtain comparable evidence by other reasonably available means." Id. "If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach." Id. at 917. The factors include:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted).

On appeal, the Appellant contends that the "portion of the stick that was lost is the one that presumably remained in the culprit's hands as he attacked the victim. Thus, it's potential to yield a DNA profile of the person holding the stick made it material." The Appellant further contends that the person who assaulted the victim and the person who had sex with the victim were not necessarily the same person. However, the Appellant did not make these arguments in the trial court. Generally, a party is bound by the evidentiary theory argued to the trial court and may not change or add theories on appeal. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Moreover, as the trial court noted, the Appellant's case was pending for over three years and the defense was aware that the stick was in the State's possession, yet the defense never sought to have the stick tested for any potential DNA. Therefore, we conclude that the Appellant was not entitled to relief under Ferguson.

F. Sufficiency of the Evidence

The Appellant contends that the evidence was insufficient to sustain his convictions, particularly because the State failed to establish his identity as the perpetrator. On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

"In order to convict a defendant of attempted second-degree murder, the state is required to prove that the [Appellant] acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part." State v. Inlow, 52 S.W.3d 101, 104 (Tenn. Crim. App. 2000) (citing Tenn. Code Ann. §§ 39-12-101(a)(2) and 39-13-210(a)). "Whether the [A]ppellant 'knowingly' attempted to kill his victim is a question of fact for the jury." Id. at 104-05. "'Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" State v. Bonds, 502 S.W.3d 118, 145 (Tenn. Crim. App. 2016) (quoting Inlow, 52 S.W.3d at 105).

Aggravated rape is defined as the unlawful sexual penetration of a victim by the defendant when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). "'Sexual penetration' means sexual intercourse, . . . anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). This court has previously stated that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).

Regarding the rape and aggravated rape convictions, the Appellant contends that the evidence at trial failed to establish the identity of the person who assaulted the victim and failed to "establish that the victim did not engage in consensual sex with the [A]ppellant at an earlier time." The Appellant's DNA was found on swabs taken from the victim's

vaginal and anal areas. Although the Appellant's theory of defense was that his DNA was present because he had consensual sex with the victim, the victim testified that she never had consensual sex with the Appellant. Additionally, the victim told the officer who found her that she had been raped. Although the victim was unable to identify the Appellant in a photograph lineup or in court, she helped the police create a computer-generated sketch of the man who lured her into her yard. The trial court noted that the sketch looked "strikingly" similar to the photograph of the Appellant that was included in the photograph lineup. Thus, we conclude that the evidence was sufficient to sustain the Appellant's convictions of rape and aggravated rape.

Regarding the attempted second degree murder conviction, we note that Dr. Evans testified that the stick which was surgically removed from the victim's throat was potentially life-threatening. Further, the jury could have reasonably concluded that the rape and the assault occurred at the same time. Accordingly, we conclude that the evidence was sufficient to sustain the Appellant's conviction of attempted second degree murder.

## G. Sentencing

Finally, the Appellant claims that his effective thirty-seven-year sentence is excessive because the trial court improperly considered a prior charge for rape of a child when the Appellant pled guilty to aggravated assault. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

The length, range, and manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

At the sentencing hearing, the State introduced a certified copy of a judgment reflecting that the Appellant was convicted of aggravated assault on January 18, 2007. The original charge was rape of a child, but the Appellant pled guilty to aggravated assault and was placed on probation.

Tonya Stewart, the Appellant's older sister, testified that the Appellant was thirty-six years old. She said that when the Appellant was six years old, he was diagnosed with mental retardation. Their mother was disabled and was unable to take care of him. On January 19, 2007, Stewart was appointed as her brother's legal conservator. Stewart said that the Appellant "probably don't know what's going on now, but he can't read or write. I have to do that for him. I've got to tell him when to take a bath. Can't cook. Can't do nothing. So he have to be told." Stewart said the Appellant did not remember things such as telephone numbers or addresses.

Stewart said:

> He don't understand none of this, what's going on. I mean, from me being around him. He wouldn't be able to tell him, if I wasn't here, what y'all talking about, the time, the date. I have to call [defense counsel]. He just need help, period. I mean, if you understand what I'm saying, is that he can't read, write. You've got to tell him – it's, like, I've got five – I've got six children of my own, and my youngest is smarter than him, and my youngest has ADHD and don't be still at all, and he's smarter than him. I tend to him more than my own children. He needed it more than them. And, since he don't know it, he can't write me a letter. He can't remember the address.

Stewart said the Appellant had never been able to hold "a real salary job." However, a motorcycle club had let him mop and sweep the floor, take out the garbage, and "be around" because Stewart had "nowhere else for him to go."

On cross-examination, Stewart said that the Appellant was never in trouble with juvenile court. Stewart clarified that she was appointed the Appellant's conservator the day after the Appellant was placed on probation for the aggravated assault conviction.

On redirect examination, Stewart said that when the Appellant was released on probation, he went to the Harold Jordan facility, which was "the [C]lover [B]ottom in Nashville" for his mental illness.[4]

The trial court found that the Appellant was a Range I, standard offender. The trial court noted that the victim had been in "special education or resource classes[] because [she has] some intellectual and mental disabilities." The trial court observed that the victim

---

[4] The defense did not present any expert testimony or evidence regarding the Appellant's mental health.

could not remember the person that committed this crime against her, but she drew a computer-generated drawing of [the person], and that computer-generated drawing of [the person] is strikingly, strikingly, almost identical to [the Appellant] when and before he cut his dreads and before he changed his appearance, and she could not identify this version of [the Appellant] in court. But she absolutely drew a picture of [the Appellant] that was almost identical to a booking photo of [the Appellant] before he cut his hair, before he put on glasses, and before he changed his appearance. And his appearance in court is drastically different from what he appeared when this offense took place in 2014.

The trial court noted that the proof at trial revealed that a significant amount of force was needed to drive the stick through the victim's throat and that the injury could have killed her if her airway had collapsed. The trial court said that "this offense . . . is about as egregious as any rape that a person could come across." The court noted that the risks and needs assessment reflected a high probability that the Appellant would commit crimes of violence in the future. The court observed that the Appellant previously had been charged with rape of a child, that he pled guilty to aggravated assault, and that he received a probationary sentence of six years.

The trial court found that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate sentencing range. Tenn. Code Ann. § 40-35-114(1). The court said that it gave "great, significant, enormous weight to the fact that [the Appellant], in fact, does have a prior felony conviction that was charged originally as a rape of a child and was reduced or amended to aggravated assault. . . . [T]he fact that he has been convicted of an aggravated assault, I give tremendous weight to that factor."

The court further found that the victim was particularly vulnerable because of her mental disability, stating that the victim did "not have the mentality of a thirty-eight-year-old." Tenn. Code Ann. § 40-35-114(4). Additionally, the court found that the Appellant treated the victim with exceptional cruelty during the commission of the crimes. Tenn. Code Ann. § 40-35-114(5). The court recounted that the victim was hit so hard that her teeth were knocked out, then she was "savagely beaten until the point that she [was] knocked out. The pictures indicate that she was probably dragged from one location to another, where this rape took place, in a field under a tree, in a vacant lot." The court said that once the victim was at the "isolated location," she was "raped[] anally, vaginally, and ha[d] a stick jammed in her throat that almost succeeded in killing her[.]"

The trial court found that the injuries sustained by the victim were particularly great. Tenn. Code Ann. § 40-35-114(6). The court stated that enhancement factor (6) was not

inherent in attempted second degree murder. The court noted that but for the intervention of the hospital staff, "there's no telling whether or not [the victim] would be alive today." The trial court found that the Appellant possessed or employed a deadly weapon during the commission of the offenses and gave that factor "extreme weight." Tenn. Code Ann. § 40-35-114(9). In mitigation, the trial court found that the Appellant had an established history of mental disabilities or mental illnesses and gave that some, "but, frankly, not significant weight." Tenn. Code Ann. § 40-35-113(8).

The trial court found that the Appellant had shown a sustained intent to violate the law, noting that the Appellant had been convicted of two sexual offenses. The court said:

> [The Appellant] is a dangerous person, and danger is exacerbated even more by the fact that he does have some mental issues that probably cannot be treated in this community, will probably have to be treated more effectively in a mental – in an institutional environment, because, if [the Appellant] is walking the streets . . . , vulnerable people, children and other vulnerable young women, are, in fact, at great risk by [the Appellant].

The trial court sentenced the Appellant to twenty-five years for the aggravated rape conviction and to twelve years for attempted second degree murder. The court found that the Appellant was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation in committing crimes in which the risk to human life was high. Additionally, the court found that the circumstances surrounding the commission of the offense were aggravated, saying that the Appellant lured the mentally and emotionally challenged victim from her home, "a place of safety," and brutally attacked her and raped her anally and vaginally. The court found that confinement for an extended period of time was necessary to protect society from the Appellant and that the length of the sentences was reasonably related to the severity of the offenses. Accordingly, the trial court ordered that the Appellant's sentences be served consecutively for a total effective sentence of thirty-seven years.

On appeal, the Appellant contends that the trial court's "decision to impose the maximum sentence appears to have been affected by his belief that the [Appellant] had committed a rape of a child offense." The Appellant complains that the trial court repeatedly referenced the Appellant's arrest for rape of a child even though the State did not introduce a factual basis concerning the prior arrest or the resulting aggravated assault conviction. The Appellant maintains that the trial court considered improper factors in determining the Appellant's sentences and that this court should "conduct a de novo review without a presumption of correctness and impose concurrent sentences that are less than the maximum afforded for each offense."

We have reviewed the trial court's findings. Although the trial court mentioned that the Appellant was arrested for rape of a child, the trial court relied on the Appellant's conviction of aggravated assault, which constituted prior criminal history for the purposes of enhancement factor (1). Tenn. Code Ann. § 40-35-114(1). Therefore, the trial court did not err by applying that enhancement factor. The Appellant does not challenge the imposition of any other enhancement factor or contend that the trial court erred by finding that he was a dangerous offender when imposing consecutive sentencing. Therefore, we conclude that the trial court did not abuse its discretion in sentencing the Appellant.

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE